Filed 1/14/14  LandValue 77 v. Bd. of Trustees of Cal. State U. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| LANDVALUE 77, LLC et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY et al.,<br><br>Defendants and Respondents,<br><br>KASHIAN ENTERPRISES, L.P.,<br><br>Real Party in Interest and Respondent. | F063653<br><br>(Super. Ct. No. 07CECG02872)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Judge.

Doyle & Schallert, David Douglas Doyle; Weintraub Tobin Chediak Coleman Grodin, Lee N. Smith; Stoel Rives, Melissa A. Foster; Alvarado Smith, William M. Hensley; Dowling Aaron and Steven M. Vartabedian for Plaintiffs and Appellants.

Crowell & Moring, J. Daniel Sharp, Nathaniel J. Wood and Ethan P. Schulman for Defendants and Respondents.

Best, Best & Krieger, Harriet A. Steiner and Kimberly E. Hood for Real Party in Interest and Respondent.

-ooOoo-

Plaintiffs appeal the denial of their motion for attorney fees under Code of Civil Procedure section 1021.5 (section 1021.5), the statute that contains California's private attorney general doctrine. We affirm.

In the underlying lawsuit, plaintiffs challenged a mixed-use development project located on 45 acres of land on the campus of the California State University, Fresno near the Save Mart Center. The land was leased by the university to a private developer that agreed to build apartments, offices, retail stores, a hotel, and a 14-screen movie theater. In 2007, during the project's public comment period, plaintiffs submitted a letter asserting that the proposed movie theater would "have severe economic consequences regarding other theaters in the Fresno/Clovis area, including the theater at Sierra Vista Mall," and might put these theaters out of business. Plaintiffs owned and managed the Sierra Vista Mall, which is about two miles east of the project.

Plaintiffs' lawsuit alleged violations of the conflict of interest statute (Gov. Code, § 1090) and the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). The trial court found that a theater sublease between the developer and Moctesuma Esparza, a member of California State University's board of trustees, violated the conflict of interest provisions in Government Code section 1090. To remedy this violation, the court voided the theater sublease. The trial court also concluded the final environmental impact report (EIR) was inadequate in its analysis of (1) the water supply for the project, (2) traffic and parking, and (3) air quality. The trial court partially set aside the certification of the EIR and directed revisions to correct the deficiencies.

Plaintiffs appealed the trial court's decision, contending the remedies were insufficient. Plaintiffs argued that (1) the proper remedy for the conflict of interest was to void the entire project and (2) the CEQA remedies should have included an injunction stopping construction. In a partially published decision, we rejected these arguments, but concluded that (1) the certification of the EIR and the project approval should have been set aside pending completion and certification of an adequate EIR and (2) the trial court

2.

should have issued a writ of mandate. (*LandValue 77, LLC v. Board of Trustees of California State University* (2011) 193 Cal.App.4th 675 (*LandValue 77*).)

After remand, plaintiffs filed a motion for attorney fees under section 1021.5. The trial court denied the motion on the ground that plaintiffs failed to carry their burden of showing that the "financial burden of private enforcement" made an award of attorney fees appropriate. (*Ibid.*) Hence, this appeal concerns the application of the "financial burden of private enforcement" element of section 1021.5, an element most recently addressed by the California Supreme Court in *Conservatorship of Whitley* (2010) 50 Cal.4th 1206 (*Whitley*) and by this court in *Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382 (*Robinson*).

The evidence in the appellate record clearly shows that plaintiffs had a financial incentive to stop or delay the opening of the project's proposed theater. Besides the assertions in their 2007 comment letter, they submitted a third party's declaration that (1) predicted the proposed project probably would cause the theater in plaintiffs' mall to operate at a loss and (2) suggested a way to estimate the number of customers that would be lost to the proposed theater. Despite the foregoing, plaintiffs (1) failed to identify with particularity their ownership and other financial interests in the Sierra Vista Mall and the businesses conducted there and (2) failed to present sufficient evidence to estimate the monetary value of the delay in the opening of a competing theater caused by the litigation. Therefore, under the cost-benefits analysis adopted in *Whitley*, *supra*, 50 Cal.4th 1206, plaintiffs failed to carry their burden of showing that their litigation expenses transcended the monetary value of the benefits that they obtained. Consequently, we agree with the trial court and affirm its order.

**FACTUAL AND PROCEDURAL SUMMARY**

*Parties*

Plaintiffs are LandValue 77, LLC, LandValue Management, LLC, and James Huelskamp. James Huelskamp is a resident of Fresno County and is the managing member of both limited liability companies. LandValue 77, LLC, owns the Sierra Vista Mall in Clovis, California, and is the entity paying plaintiffs' legal fees. LandValue Management, LLC, manages the Sierra Vista Mall for LandValue 77, LLC.

Defendants are (1) California State University (University), (2) the Board of Trustees of California State University (Board of Trustees), (3) California State University, Fresno Association, Inc. (CSUF Association), (4) Maya Cinemas North America, Inc. (Maya Cinemas), (5) Moctesuma Esparza, and (6) Kashian Enterprises, L.P.

CSUF Association, a California nonprofit public benefit corporation, is an auxiliary organization of the University authorized by the Board of Trustees to perform certain functions on behalf of the California State University, Fresno, such as the development of real property. (See Ed. Code, § 89901 ["'auxiliary organization'" defined]; Cal. Code Regs., tit. 5, § 42500 [functions of auxiliary organizations].)

Esparza was a member of the Board of Trustees from July 2004 until he resigned in May 2007. He is the chief executive officer of Maya Cinemas and a shareholder in that corporation.

Kashian Enterprises, L.P.'s general partner is Edward M. Kashian. He and his affiliated entities, including Campus Pointe Commercial, L.P., collectively are referred to as Kashian Enterprises.

*The Campus Pointe Project*

The Campus Pointe project is a mixed-use development on 45 acres of land located on the Fresno campus of the University. The project is being completed by Kashian Enterprises, which obtained rights to the land through a long-term ground lease.

4.

According to a 2005 notice of preparation, the proposed project included (1) a commercial parcel for office space (30,000 square feet), retail space (150,000 square feet) and a theater (55,000 square feet with 2,700 seats); (2) a hotel parcel; (3) a senior housing parcel for 180 units; (4) a market rate apartment parcel for 342 units; and (5) a possible future parcel for more office space.

The project is located at the corner of Shaw and Chestnut Avenues, adjacent to State Route 168. The Sierra Vista Mall is located two miles to the east, at the southeast corner of Shaw and Clovis Avenues.

*Project Approval and EIR Certification*

In February 2007, a final EIR for the project was released. Before the Board of Trustees met to certify the final EIR, an attorney representing plaintiffs submitted a comment letter objecting to the project on the grounds that it failed to further the University's educational mission, involved a conflict of interest for Esparza, had inadequate parking, and created a risk of economic blight. The March 13, 2007, letter asserted:

> "[T]he addition of a theater at Campus Pointe will have severe economic consequences regarding other theaters in the Fresno/Clovis area, including the theater at Sierra Vista Mall. Movie theaters primarily attract customers within a five mile zone. Any time theaters are less than five miles from each other, each theater only receives approximately half of the available revenue in the market. The impact of the new theater at Campus Pointe would be to cause the theaters at the Sierra Vista Mall and U[A] Cinema 8 to operate with a loss which could result in these theaters going out of business…. The economic impact would not be limited to just the theaters themselves, but would also adversely [a]ffect adjacent and related business that rely on these theaters for customers to survive."

The letter included a declaration of Daniel F. Tocchini, who was experienced in theater management and operation in California and Nevada. Tocchini asserted that the "proposed theater will have a severe adverse impact on other theaters in the Fresno/Clovis Area for two reasons." The first reason concerned a disguised public

5.

subsidy in the form of access to parking. The second reason concerned the economic impact of having an excess number of screens within a customer service area. Tocchini asserted:

> "I believe that it is probable that the theater in Sierra Vista Mall would operate at a loss, along with the UA Theater located in Clovis, which would be impacted more adversely than the Sierra Vista Mall theater, because it is located closer to the proposed development at Campus Pointe. In the theater business, an excessive number of theaters results in too many screens, which results in theaters going out of business. The proposed theater at Campus Pointe is only approximately two miles from the Sierra Vista Mall Theater, with the UA Theater located in between."

In March 2007, the Board of Trustees certified the final EIR, which included the public comments submitted on the draft EIR and the University's responses. The comments included the City of Clovis's regarding the project's potential for causing a significant environmental impact in the form of urban decay. The final EIR rejected the assertion that the project would have a deleterious economic effect on Clovis businesses and referred to "the Lead Agency's determination that the proposed Project's commercial element could not have a significant *economic and social* impact (leading to urban decay) .…"

In April 2007, plaintiffs filed a verified complaint challenging the project within the 30-day statute of limitations triggered by the notice of determination sent by the University to the State Clearinghouse on March 14, 2007. That lawsuit was not ripe, as the University had rescinded its certification of the final EIR the day before the lawsuit was filed.

In May 2007, Esparza addressed the potential conflict of interest created by Maya Cinemas's theater sublease with the developer by resigning from the Board of Trustees. A few days later, the Board of Trustees again considered and certified the final EIR.

6.

***The Underlying Lawsuit***

In June 2007, plaintiffs filed a second lawsuit challenging the approval of the Campus Pointe project. On July 1, 2009, the trial court filed a 114-page combined statement of decision that addressed the claims in plaintiffs' two lawsuits. The court implemented its decision by entering a judgment of dismissal in the first lawsuit and a judgment in the second lawsuit that voided the theater sublease and required the University to correct inadequacies in the final EIR.

Our February 2011 opinion in *LandValue 77*, *supra*, 193 Cal.App.4th 675 affirmed that judgment in part and reversed it in part. We concluded that (1) the violation of the conflict of interest provision in Government Code section 1090 did not require a broader remedy than voiding the theater sublease; (2) the writ of mandate addressing the CEQA violations should have directed the University to set aside its certification of the final EIR and its approval of the project; and (3) the trial court did not abuse its discretion in declining to enjoin construction work. We directed a modification of the judgment and the immediate issuance of a writ of mandate (something the trial court never got around to doing). We also ordered the parties to bear their own costs on appeal. (*LandValue 77*, *supra*, at p. 684.)

After remand, the trial court issued a writ of mandate. About five months later, the University filed a return to the writ. Defendants assert they complied with the writ by revising the EIR, circulating it for public comment, and holding a public hearing before certifying the revised EIR. Defendants also assert plaintiffs have not challenged the revised EIR.

***The Motion for Attorney Fees***

In June 2011, shortly after the trial court issued the writ of mandate, plaintiffs filed a second or renewed motion for attorney fees.[1] Plaintiffs claimed the fees in excess of

---

[1] The original motion was filed in July 2009, before the first appeal.

$700,000 spent on the underlying litigation, plus the more than $200,000 spent in pursuing the appeal, were much higher than the impact the project might have had on their business. In addition, they argued a multiplier of 2.0 was justified because of the lag in their attorneys obtaining full payment and the prolonged nature of the litigation, which was caused in part by defendants' "scorched earth" tactics.

Plaintiffs' moving papers included a declaration from Huelskamp that stated he had filed the lawsuit based on concerns about the environment, including parking, traffic and air quality issues, the financial impact of the project on students, and the impact on taxpayers. Paragraph 33 of Huelskamp's declaration asserted that the assumption he would spend the time and money involved in the lawsuit "for competitive reasons is totally false" and referred to the finding in the final EIR that the project would not have a significant adverse impact on the economy.

Defendants' opposition to the motion for attorney fees contained several arguments, the first of which is central to this appeal: Whether LandValue had demonstrated that its litigation costs transcended the advancement of its own economic interests? Defendants specifically referenced LandValue's March 2007 comments opposing the project, which included Tocchini's declaration, and asserted the comments' focus "was that allowing a movie theater at Campus Pointe could cause LandValue's theater at Sierra Vista Mall to 'operate at a loss.'" Defendants also asserted "LandValue's goal here, as reflected in the record, is to preserve its business profits free from the competing Campus Pointe Project."

Plaintiffs' reply addressed their economic interests by claiming "the only financial benefit to LandValue is if it's [*sic*] tenant theatre's income increased such that a bonus was paid to the landlord above the base rent, which has not occurred." Based on this narrow view of their economic interests, plaintiffs maintained they had no economic reason to file an appeal after the sublease was voided.

8.

The trial court reviewed the papers filed and issued a tentative ruling to deny the motion for attorney fees.  In response to the tentative ruling, plaintiffs' counsel requested a hearing.

At the August 9, 2011, hearing, counsel for plaintiffs expressed surprise at the way the court dealt with the issue regarding their burden to present evidence showing the "financial burden of private enforcement" requirement in section 1021.5.  Plaintiffs asserted any economic benefit from the litigation was speculative because of the difficulty in comparing the amount of money that would be made without a theater at Campus Pointe versus the amount that would be made with a theater there.  Plaintiffs argued that this burden was impossible and that the tentative ruling required them to prove a negative—that is, the absence of any economic benefit.  Plaintiffs also asserted that the court's view of their burden would require them to present confidential financial information.

Plaintiffs requested additional briefing on the issue and lodged with the court a declaration by Huelskamp that provided additional information about (1) his financial interest in the theater that leases space at the Sierra Vista Mall and (2) the terms of that lease.

During the hearing, the judge addressed plaintiffs' failure to carry its burden regarding their financial stake in the litigation.  The judge contrasted the lack of information in plaintiffs' moving papers with information that was within his personal knowledge or experience, which he bolstered by indicating that he lived two miles from the Sierra Vista Mall.  Some of the trial court's comments, which plaintiffs contend were inappropriate, are described later in this opinion.  (See part II.E.3., *post*.)

At the hearing, defense counsel addressed plaintiffs' economic interests by arguing that the litigation had slowed down, if not precluded, the construction of the retail center at Campus Pointe and that plaintiffs had obtained a direct financial benefit by

9.

delaying the project—a delay that was ongoing—and postponing having their theater's revenue cut in half as described in the Tocchini declaration.

On August 10, 2011, the trial court issued a written minute order denying the motion and denying plaintiffs' attempt to submit a declaration on the day of the hearing.[2] The trial court's rationale for denying attorney fees is set forth in part II.A., *post*.

After the appeal was initiated, we granted requests to take judicial notice of the appendix, administrative record, briefs and appellate opinion in the underlying appeal, *LandValue 77*, *supra*, 193 Cal.App.4th 675.

## DISCUSSION

### I. Motion for Attorney Fees

#### A. Overview of Section 1021.5

Section 1021.5 sets forth California's private attorney general doctrine, which is an exception to the usual rule that each party bears its own attorney fees. (*Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1147; see Code Civ. Proc., § 1021.) The purpose of section 1021.5 is to compensate with attorney fees "all litigants and attorneys who step forward to engage in public interest litigation when there are insufficient financial incentives to justify the litigation in economic terms." (*Whitley*,

---

[2] The August 9, 2011, declaration of Huelskamp also was the subject of a request by plaintiffs to augment the appellate record. In July 2012, we granted the request, but left open the question whether we could consider the declaration in our review of this appeal. Because the trial court properly declined to consider the declaration on the ground it was untimely, we have not relied on its contents in deciding this appeal.

Even if the declaration had been part of the evidence before the trial court, it would not have changed the outcome because it fails to provide sufficient information to carry plaintiffs' burden regarding the value of the benefits they obtained from the litigation. Indeed, parts of the declaration are not helpful to plaintiffs' position. For instance, it discloses Huelskamp's *one-third* ownership interest in Sierra Vista Cinema 16, the lessee of the theater in Sierra Vista Mall. The motion for attorney fees did not acknowledge Huelskamp's personal ownership interest in the theater and did not analyze the benefits that the theater business obtained from the litigation.

*supra*, 50 Cal.4th at p. 1211.)  Such an award encourages suits that enforce important public policies.  (*Graham v. DaimlerChrysler Corp*. (2004) 34 Cal.4th 553, 565.)  Section 1021.5 provides in relevant part:

> "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if:  (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

This language has been divided in various ways.  We will identify the following six elements.  "A superior court may award attorney fees to (1) a successful party in any action (2) that has resulted in the enforcement of an important right affecting the public interest if (3) a significant benefit has been conferred on the general public or a large class of persons, (4) private enforcement is necessary because no public entity or official pursued enforcement or litigation, (5) the financial burden of private enforcement is such as to make a fee award appropriate, and (6) in the interests of justice the fees should not be paid out of the recovery."  (*Robinson*, *supra*, 202 Cal.App.4th at p. 390, fn. omitted.)

Courts have interpreted section 1021.5 to require that each element be satisfied to justify an award of attorney fees.  (*Robinson*, *supra*, 202 Cal.App.4th at pp. 390-391; *County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 648.)  Thus, a trial court's order denying a motion for attorney fees under section 1021.5 will be upheld if the appellate court determines that any one of the elements is missing.

## B.    Standard of Review

The standard of review normally applied to a superior court's ruling on a motion for attorney fees under section 1021.5 is abuse of discretion.  (*Whitley*, *supra*, 50 Cal.4th at p. 1213.)  De novo review, however, is warranted when the determination of whether

the statutory criteria have been satisfied in a particular set of circumstances amounts to statutory construction and a question of law. (*Ibid*.)

Stated differently, whether a statutory criterion was met presents a mixed question of law and fact in some circumstances, and, if factual questions predominate, appellate courts apply the deferential abuse of discretion standard. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.) In contrast, other circumstances may arise where the material facts are largely undisputed and, therefore, the question is treated as one of law subject to independent review on appeal.[3] (*Connerly*, *supra*, at pp. 1175-1176.)

In *Robinson*, *supra*, 202 Cal.App.4th 382, this court explained that applying the criteria of section 1021.5 often involves questions of law and a two-step approach to appellate review may be useful in some cases. (*Robinson*, *supra*, at p. 391.) The first step involves a determination "whether the superior court applied the proper legal standards in reaching its determination." (*Ibid*.) If the proper legal standards were applied, the appellate court takes the second step and determines "whether the result was within the range of the superior court's discretion—that is, whether there was a reasonable basis for the decision. [Citation.]" (*Ibid*.)

Here, the burden of proving the statutory elements played an important role in the trial court's decision. Generally, when a trial court decides the claimant failed to meet his or her burden of proof regarding one or more of the statutory elements, that determination will not be disturbed on appeal absent a clear abuse of discretion. (*New*

---

**3** The willingness of appellate courts to treat the application of the statutory criteria as presenting questions of law explains the relatively large number of appellate decisions that have reversed denials of attorney fees under section 1021.5. (*Robinson*, *supra*, 202 Cal.App.4th at p. 391; e.g., *Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1030 [element of enforcement of important right affecting the public interest satisfied; remanded to trial court for consideration of other elements]; *Protect Our Water v. County of Merced* (2005) 130 Cal.App.4th 488, 497-498 [this court reversed trial court's denial of attorney fees in a CEQA lawsuit, concluding as a matter of law that all criteria of § 1021.5 had been satisfied].)

*West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 849.) Our inquiry into whether a clear abuse of discretion occurred does not involve a reweighing of the evidence. (See *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 883 [appellate court does not reweigh the evidence in considering whether trial court abused its discretion].)

## II.    Financial Burden of Private Enforcement

### A.    *Trial Court's Decision to Deny Attorney Fees*

The trial court's August 10, 2011, minute order included a straightforward three-paragraph explanation of its decision to deny plaintiffs' motion.

The first paragraph set forth section 1021.5's elements that determine a claimant's eligibility for an award of attorney fees and the rule of law that a claimant has the burden of establishing each element. The first paragraph is an accurate statement of applicable law. (See *RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 777 [party seeking attorney fees has the burden of establishing that its litigation costs transcended its personal interests]; *Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106, 113 (*Colony II*) [plaintiff "bears the burden of establishing that its litigation costs transcend its personal interest"].)

The second paragraph consists entirely of the following language taken from *Whitley*, *supra*, 50 Cal.4th 1206:

> "In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. '"An award on the 'private attorney general theory' is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' [Citation.]"' [Citation.] 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.' [Citation.]" (*Id.* at p. 1215.)

This statement accurately describes some of the legal standards governing the application of the "financial burden of private enforcement" element. Plaintiffs do not contend the paragraph misstates the law.

The controversial part of the trial court's written decision is the third and final paragraph, which describes how the court applied the principles from *Whitley* to plaintiffs' motion:

> "Petitioners Landvalue 77, LLC, Landvalue Management, LLC, and James Huelskamp ('Petitioners'), the managing member of the 2 limited liability companies, had an individual stake in this matter because the project included the planned construction of a competing movie theater, and had the project not been approved, it logically would have resulted in a pecuniary benefit to them. The court has no way of knowing whether the financial burden of private enforcement requires subsidizing Petitioners' attorneys; Petitioners have not shown the necessity and financial burden of private enforcement are such as to make an award of attorney's fees pursuant to Code of Civil Procedure section 1021.5 appropriate. ([*Whitley*, *supra*,] 50 Cal.4th [at pp.] 1214-1215; [*Colony II*, *supra*,] 166 Cal.App.3d [at p.] 113.)"

The trial court's conclusion tracks the statutory language that refers to "the necessity and financial burden of private enforcement" (§ 1021.5) and does not refer to the other statutory elements. Thus, our analysis is limited to the "necessity" element and the "financial burden of private enforcement" element.

### B.     Plaintiffs' Contentions

Plaintiffs contend, without serious opposition from defendants, that the necessity of private enforcement was established once the City of Fresno settled its lawsuit against the University.

As to the "financial burden of private enforcement" element, plaintiffs contend the trial court erred by (1) ignoring its earlier findings that the project would have no adverse economic impact on existing business, (2) basing its tentative ruling and subsequent decision on matters the court raised and developed, rather than issues presented by

14.

defendants, (3) considering matters outside the scope of the record, (4) considering possible financial benefits that were not immediate and direct, (5) applying the wrong legal standard to the conflict of interest portion of the litigation, (6) failing to separately consider the CEQA part of the litigation and find plaintiffs obtained no benefit from it, and (7) failing to separately consider and award attorney fees for the time spent on the first appeal.

### C.     *Necessity of Private Enforcement*

The trial court's written decision stated that plaintiffs had not shown the necessity and financial burden of private enforcement made a fee award appropriate. Based on our interpretation of the proceedings below, we conclude that the court's inclusion of the "necessity" element was inadvertent.

The analysis of necessity is the most direct of all the elements contained in section 1021.5. To determine whether or not it exists, courts "consider only one fact— the availability of public enforcement." (*Robinson*, *supra*, 202 Cal.App.4th at p. 401; see *Whitley*, *supra*, 50 Cal.4th at p. 1215 ["'necessity'" looks at the adequacy of public enforcement].) Although the City of Fresno also filed a lawsuit challenging the Campus Pointe project, that suit was settled or dismissed before 2008. Thereafter, none of the claims pursued by plaintiffs were being pursued by a state agency, a local governmental entity, or any public official. Because no public entity or official was attempting to enforce CEQA or the conflict of interest statute, it follows that private enforcement was necessary. Because necessity so clearly exists in this case, we believe the trial court inadvertently included that element in its decision and meant to deny the motion for attorney fees based solely on its determination that plaintiffs failed to carry their burden of establishing the "financial burden of private enforcement" element of section 1021.5. Therefore, the remainder of our discussion is limited to issues involving that element.

15.

#### D.	General Principles Governing Analysis of Financial Incentives

As background for the discussion of plaintiffs' specific claims of reversible error, we note that the "financial burden of private enforcement" element concerns the costs of litigation and any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield.  (*Whitley*, *supra*, 50 Cal.4th at p. 1215.)  As a general proposition, an award of attorney fees is appropriate when the cost of the claimant's legal victory transcends his or her personal interest and places a burden on the claimant out of proportion to his or her individual stake in the matter.  (*Ibid*.)

In *Whitley*, *supra*, 50 Cal.4th 1206, our Supreme Court went beyond a general description of the statutory element and adopted a specific cost-benefit approach for evaluating the financial burdens and incentives involved in pursuing a lawsuit.  (*Id.* at p. 1215.)  We must apply this cost-benefit approach when evaluating the "financial burden of private enforcement" element of section 1021.5.

##### 1.	Benefits Side

The benefits side of the cost-benefit equation contains two components, which are multiplied by one another.  (*Robinson*, *supra*, 202 Cal.App.4th at p. 402.)

The first component requires the trial court to fix or estimate "'the monetary value of the benefits obtained by the successful litigants .…'"  (*Whitley*, *supra*, 50 Cal.4th at p. 1215, quoting *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 9.)  The term "benefits obtained" also was described as "'the gains actually attained'" and "'total benefits.'"  (*Whitley*, *supra*, at p. 1215; see *Robinson*, *supra*, 202 Cal.App.4th at p. 402.)[4]

---

[4]	In applying the first component of the benefits calculation, another court has adopted an interpretation of *Whitley* different from *Robinson*.  (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 154-155, fn. 10.)  Instead of multiplying the benefits obtained (i.e., the gains actually attained) by an estimate of the probability of success, *Collins* stated:  "The successful litigant's reasonably expected financial benefits are determined by discounting the monetary value of the benefits that the successful

The second component requires the trial court to estimate "'the probability of success at the time the vital litigation decisions were made .…'" (*Whitley*, *supra*, 50 Cal.4th at p. 1215.)

When the two components are multiplied together, the product is "'the estimated value of the case at the time the vital litigation decisions were being made.'" (*Whitley*, *supra*, 50 Cal.4th at p. 1215.) The reason this discounted figure is used as the estimated value for the benefits side of the equation is that the discounted figure, not actual recovery, more closely approximates a plaintiff's incentives for pursuing the litigation. (*Id*. at pp. 1220-1221, 1215.)

### 2.     Costs Side

The costs side of the cost-benefit analysis is based on the *actual* costs of the litigation, which include attorney fees, deposition costs, expert witness fees, and other expenses required to bring the case to fruition. (*Whitley*, *supra*, 50 Cal.4th at pp. 1215-1216.)

### 3.     Comparison

The final step in the cost-benefit analysis is to compare the estimated or expected value of the case to the actual cost and make a value judgment whether it is desirable to encourage litigation of that sort by providing a bounty. (*Whitley*, *supra*, 50 Cal.4th at p. 1216.) "'[W]here the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs,'" an award of attorney fees is not appropriate. (*Ibid.*)

---

litigant *reasonably expected* at the time the vital litigation decisions were made by the probability of success at that time." (*Id*. at p. 154, italics added, fn. omitted.) Plaintiffs' evidence regarding their financial interests and the value of the benefits of the litigation, whether reasonably expected or actually attained, was insufficient to carry its burden.

17.

#### 4. Irrelevancy of Subjective Motives

Huelskamp's July 2009 declaration asserts that his "motivation for filing the lawsuit related to the environmental issues that were raised by the Campus Pointe Project, including traffic, and the underparked Project (this Project does not park itself; it relies on offset Fresno State parking that is already over-utilized) in addition to the financial impact on students and taxpayers." Huelskamp also stated he was concerned about drought and water supply problems for the valley and where the additional water supply would come from to service the project.

In *Whitley*, *supra*, 50 Cal.4th 1206, the California Supreme Court interpreted the "financial burden of private enforcement" language in section 1021.5 as being concerned with the objective financial incentives of the litigation, not nonfinancial motives. (*Whitley*, *supra*, at p. 1224.) Specifically, the court held that a litigant's personal nonpecuniary motives may not be used to disqualify the litigant from obtaining fees under section 1021.5 (*Whitley*, *supra*, at p. 1211.)

In this case, we conclude that Huelskamp's subjective motivations for bringing the lawsuit are irrelevant to our review of the trial court's determination regarding the "financial burden of private enforcement." (§ 1021.5.) Thus, the "objective financial incentives" are the only proper subject of our assessment of the benefit side of the cost-benefit analysis. (*Whitley*, *supra*, 50 Cal.4th at p. 1221.) In short, a claimant's declaration of altruistic motives is not a substitute for presenting the information necessary for the trial court to perform the cost-benefit analysis set forth in *Whitley*.[5]

---

[5] A practical consequence of the principle that a moving party's subjective motivations are irrelevant is that trial courts are not required to evaluate claims of altruistic motives and make credibility determinations regarding those claims, which are self-serving even when sincere.

18.

### E. Claims of Procedural Error in Trial Court's Decision Making Process

A number of plaintiffs' claims of reversible error concern alleged flaws in the trial court's decision making process. These claims can be categorized as procedural and concern whether the trial court (1) ignored and contradicted its earlier findings, (2) surprised plaintiffs by raising and developing an analysis of points not presented by defendants, or (3) relied on matters outside the record.

#### 1. Prior Findings Regarding Urban Decay

Plaintiffs contend the trial court's determination that the litigation resulted in a pecuniary benefit to them directly contradicts findings at pages 60 and 61 of the combined statement of decision filed in July 2009. Plaintiffs assert those findings establish that the Campus Pointe project would not cause them economic harm and, therefore, they did not benefit economically from delaying the project or potentially stopping the competing theater. Plaintiffs also contend that they relied on these findings in presenting their motion for attorney fees under section 1021.5.

The portion of the combined statement of decision referred to by plaintiffs discusses a letter prepared by Daniel Tocchini, which the trial court discussed in the context of whether there was "any credible evidence that potential economic impacts of the project on surrounding businesses would lead to significant environmental impacts":

> "His letter offers no more than further concerns about economic competition. Nothing in his letter mentions physical blight. Nothing in his letter mentions any evidence that the economic competition might force his business, or any other business, to close leading to economic blight. It discusses the Sierra Vista Mall's theater's ability to purchase films, and the impact of having another theater in the same zone (within five miles or less) and the two theaters having to 'share' films. It mentions that the project's theater, if it were receiving a 'public subsidy,' would cause the Sierra Vista Mall's theater to operate at a loss. It discusses other multiplex stadium theaters in northern Fresno that would 'result in too many screens.' 'The location being subsidized would, without question, have an economic advantage over the rest.' [Citation to letter in administrative record.]"

The trial court concluded the comments that the project's economic impacts could result in adverse, physical impacts to the environment were general in nature and the Board of Trustees's responses to those comments, which comments included the Tocchini letter, were adequate for purposes of CEQA.

Plaintiffs' interpretation of the combined statement of decision as containing a finding that the Campus Pointe project would have *no* adverse economic impact on businesses near the project (such as the theater at the Sierra Vista Mall) is incorrect. First, a superior court reviewing an agency's action for compliance with CEQA sits as a court of review, not as a trier of fact. (*Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1277 [agency is finder of fact; superior and appellate courts apply same standard of review].) Thus, the trial court did not make *findings of fact* when it analyzed the legal question of the adequacy of the Board of Trustees's responses to comments. Second, and more to the point, what the Board of Trustees found and the trial court accepted was that the project's potential economic impacts would not be so severe that they caused businesses to close *and* those locations to remain vacant long enough for urban decay or blight-like conditions to develop. (See generally *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1204-1213 [some projects have the potential to cause urban decay, which may constitute a significant environmental impact].) Thus, the trial court's statement that nothing in Tocchini's "letter mentions any evidence that the economic competition might force his business, or any other business, to close *leading to economic blight*" (italics added) is not the equivalent of stating that the economic competition from the completed project would not impact the existing businesses in the area by reducing their customer volume and thus their revenues. The new competition could reduce revenues without causing business closures or, if closures and vacancies were caused, they might not have lasted so long as to produce urban decay.

Consequently, at the hearing on the motion for attorney fees when the trial court adopted the view that a competing theater would have an adverse economic impact on plaintiffs, that finding (1) did not contradict the combined statement of decision and (2) was supported by substantial evidence in the record—specifically, the material submitted by plaintiffs during the administrative process concerning environmental impacts and CEQA compliance.

### 2.     Issues Raised by Adversarial Process

Plaintiffs contend the trial court's tentative ruling caught them by surprise because it developed an approach to the "financial burden of private enforcement" element that was not presented in the arguments of defense counsel. We reject this contention on two grounds.

First, defendants' opposition to the motion for attorney fees expressly argued that LandValue had failed to demonstrate its litigation costs transcended the advancement of its own economic interests. Thus, defendants unequivocally raised the "financial burden of private enforcement" element and plaintiffs' burden to prove that element. Defendants also asserted "LandValue's goal here, as reflected in the record, is to preserve its business profits free from the competing Campus Pointe Project." This and other arguments made by defendants raised the more specific point that the benefit plaintiffs obtained from the litigation was a reduction in competition, particularly as it affected the theater at Sierra Vista Mall.

Second, the trial court was obligated to decide the motion by applying existing law to the facts presented. In particular, the California Supreme Court's decision in *Whitley*, *supra*, 50 Cal.4th 1206, required the trial court to evaluate the plaintiffs' showing regarding the "financial burden of private enforcement" element using the cost-benefits analysis set forth in that decision. In other words, the *Whitley* decision put plaintiffs on notice of their burden to present sufficient evidence to allow the trial court to complete the requisite evaluation of the benefit side of that analysis.

Therefore, the trial court did not go beyond the issues presented by the motion for attorney fees and applicable law.

### 3.  Matters Outside the Record

Plaintiffs also claim the trial court based its decision to deny an award of attorney fees on its personal knowledge, opinions and assumptions about factual matters involving plaintiffs' business and local economic conditions.  At the August 2011 hearing, the trial court stated:

> "[Y]ou would, rather, have to be living under a rock in Fresno to not know that Huelskamp who is also Landvalue and who is also Landvalue Holdings, the same guy, he's the principal, it's his company.  He just spent millions of dollars expanding that center, four and a half miles away from Fresno State.  [¶]  That center remains.  I live 2 miles away from it, largely vacant.  What does it have?  It has retail.  It wants to have retail, but it doesn't have retail.  He keeps losing business.  So had the retail gone in Fresno State with a captive audience, again, not a rocket scientist would have to figure out that he's going to lose money, even more money than he's losing right now."

The foregoing excerpt from the hearing transcript demonstrates the trial court did consider matters outside the record.  The court may have referred to these matters because it was frustrated with plaintiffs' failure to assess their financial interests realistically and provide the information necessary to evaluate the economic benefits attained in the litigation—an evaluation the trial court correctly believed was necessary to complete the cost-benefit analysis required by *Whitley*.

Regardless of the reason for the trial court's mentioning matters from outside the record, those matters have no impact on the critical question presented in this appeal—whether plaintiffs failed to carry their burden of establishing the "financial burden of private enforcement" element of section 1021.5.  Here, the trial court did not regard the extraneous matters as outweighing or offsetting the evidence produced by plaintiffs.  Consequently, that discussion does not taint or otherwise undermine the trial court's

22.

conclusion that plaintiffs failed to carry their burden. We therefore conclude that the trial court's discussion of matters outside the record does not constitute reversible error.

### F. *Claims of Legal Error in Trial Court's Analysis*

Plaintiffs claims of substantive legal error concern whether the trial court should have (1) limited its analysis of possible financial benefits to those that were immediate and direct, (2) applied a different legal standard to the conflict of interest portion of the litigation, (3) separately considered the CEQA part of the litigation and found plaintiffs obtained no benefit from it, and (4) separately considered and awarded attorney fees for the time spent on the first appeal.

### 1. Immediate and Direct Benefits

Plaintiffs contend that only *immediate and direct* benefits are considered when the trial court undertakes its estimate of "'the monetary value of the benefits obtained by the successful litigants themselves.'" (*Whitley*, *supra*, 50 Cal.4th at p. 1215.) This contention presents a question of law regarding the correct legal standard to be applied when evaluating the benefits side of the cost-benefits analysis adopted in *Whitley*.

First, the California Supreme Court has not resolved this question of law by stating that only immediate and direct benefits are relevant to the estimate of the monetary value of the benefits obtained by the successful litigants.

Second, the statutory text, which states that the "financial burden of private enforcement [must be] such as to make the award appropriate" (§ 1021.5), does not expressly impose the immediate and direct limitation urged by plaintiffs. Although the statutory term "appropriate" is susceptible to several interpretations, its generality suggests the Legislature intended courts to conduct a case-by-case evaluation and did not intend to restrict the consideration of benefits obtained in the litigation to immediate and direct benefits.

23.

Third, we have found, and plaintiffs have cited, no decision from the Court of Appeal that expressly states immediate and direct benefits are the *only* type of benefits to be considered when estimating the monetary value of the benefits obtained by successful litigants.

Plaintiffs might have derived the immediate and direct limitation from language in *Colony II*, *supra*, 166 Cal.App.3d 106. In that case, the owner-developer of land adjacent to San Dieguito Lagoon wished to (1) restore land that had been violently washed away, (2) construct a retaining wall to protect the restored land from encroaching waters of the lagoon, and (3) build 10 condominium units. (*Beach Colony II v. California Coastal Com.* (1984) 151 Cal.App.3d 1107, 1111.) In response to the owner's permit application, the Coastal Commission imposed conditions that required there be no net decrease in wetlands as measured on a date *after* the event that washed away part of the owner's land. (*Id.* at p. 1110.) This condition meant the owner was required to carve out dry land to offset the wetland that would have been reclaimed by the proposed retaining wall. (*Ibid.*)

The owner challenged the special conditions and succeeded in having them struck. (*Beach Colony II v. California Coastal Com.*, *supra*, 151 Cal.App.3d at p. 1120 [trial court's order striking special conditions upheld on appeal].) The owner then claimed attorney fees and the trial court awarded $50,550 under section 1021.5. (*Colony II*, *supra*, 166 Cal.App.3d at p. 109.) The appellate court reserved the award, concluding that the owner had not produced evidence to show its legal costs transcended its personal interest in removing the special condition. (*Id.* at p. 115.)

The facts presented in *Colony II*, *supra*, 166 Cal.App.3d 106, demonstrated that the property owner had a strong economic incentive to seek the removal of the special conditions. If the special conditions had been imposed, the owner's cost of offsite improvements would have increased from $500,000 to approximately $800,000. (*Id.* at p. 114.) Thus, by spending $50,550 in attorney fees, the owner was able to save

24.

$300,000 in expenses. (*Ibid.*) The owner's request for attorney fees made no attempt to compare its litigation costs with the economic benefit of reduced construction costs. Instead, the owner's sole contention was that the general public got something for nothing at the owner's expense.[6] (*Colony II*, *supra*, at p. 113.) The owner's position led the appellate court to state that the owner had ignored "the fact that the benefits it obtained are *immediately and directly* translated into monetary terms." (*Ibid.*, italics added.) This statement might be the basis for plaintiffs' contention that benefits must be immediate and direct before they are considered in the cost-benefit analysis required by *Whitley*, *supra*, 50 Cal.4th at page 1215.

In addition, since the briefing in this appeal was completed, the Fourth Appellate District used the terms "direct benefit" and "direct pecuniary benefit" in a case involving a request for attorney fees under section 1021.5. (*Norberg v. California Coastal Com.* (2013) 221 Cal.App.4th 535, 539, 547.) The court stated that the issuance of the writ invalidating permit conditions "was of direct benefit to Norberg in that it allowed him to pursue his desired $250,000 in property enhancements" although the financial incentives were difficult to quantify. (*Id.* at p. 547.) The court did not remand for the trial court to make findings as to the value of the financial incentives because the denial of fees was justified on other grounds. Specifically, the court determined that the writ obtained "did not confer a benefit on anyone other than Norberg" (*id.* at p. 543) and, therefore, did not confer a significant benefit on the general public or large class of persons as required by section 1021.5.

---

**6**     We note that *Colony II* is similar to the instant case in that it involves a failure by the moving party to carry its burden of proof and, more specifically, to recognize the value of the benefits obtained. The cases are dissimilar because the benefit of decreased construction costs in *Colony II* was easy to quantify, while determining "'the monetary value of the benefits obtained by'" (*Whitley*, *supra*, 50 Cal.4th at p. 1215) LandValue and Huelskamp in delaying competition from the Campus Pointe project is more complex.

We conclude that existing case law does not support plaintiffs' position that the successful litigant's benefits must be immediate and direct to be relevant for purposes of section 1021.5. *Colony II* and *Norberg* did not require the benefits obtained in the litigation to be direct. They simply acknowledge that the benefits in those cases were direct and do not create a rule of law that restricts the consideration of benefits to those that are direct.

Furthermore, the immediate and direct limitation contradicts the California Supreme Court's reference to "objective financial incentives" as the proper subject of inquiry. (*Whitley*, *supra*, 50 Cal.4th at p. 1221.) An objectively reasonable litigant could be motivated by financial incentives that are not immediate as well as incentives that are not direct.[7] Based on the statutory language and the objective standard adopted by our Supreme Court to evaluate the financial incentives of litigation, we conclude trial courts should decide on a case-by-case basis whether a particular benefit has enough certainty that it acted as an incentive and, therefore, is included in the estimate of the monetary value of the benefits obtained.

Plaintiffs argue that attempting to quantify the benefit of competitive advantages obtained in the litigation would have taken the trial court into the realm of speculation and, contrary to Civil Code sections 3531 and 3532, required them to conduct an impossible and thus idle analysis. We disagree and conclude that courts and litigants are capable of addressing whether, in the particular case, it is possible to make a reasonable *estimate* of the monetary value of benefits such as delayed competition. (See *Whitley*,

---

**7** For example, the benefits of forestalling competition are not reaped upon the entry of judgment. Instead, they are realized in the future when the litigant does business with a customer or customers that otherwise would have gone to the competitor. (See *United Systems of Arkansas, Inc. v. Stamison* (1998) 63 Cal.App.4th 1001, 1013 [plaintiff sued to enforce requirements for competitive bidding on public contracts and obtained a chance at getting a contract worth almost half a million dollars—an incentive that justified the litigation expense and rendered a fee award inappropriate].)

*supra*, 50 Cal.4th at p. 1215 [trial courts must fix, or at least estimate, the monetary value of benefits obtained]. ) In other contexts, litigants present evidence and arguments that involve estimating the monetary value of litigation and courts evaluate that evidence and reach an estimate. In particular, when a plaintiff settles with one of several joint tortfeasors or co-obligors on a contract without releasing the others, the settling defendant will be discharged from liability to the other defendants for contribution or indemnity if the settlement is made in "good faith." (Code Civ. Proc., § 877, subds. (a) & (b); see Code Civ. Proc., § 664.6 [motion to enforce settlement].) The good faith of a settlement is judged by whether it is within the "reasonable range" of the settling defendant's relative share of the liability—that is, whether the settlement is in the "'ballpark.'" (*Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 & 501, fn. 9.) In addition to deciding what constitutes a reasonable range and, therefore, is in the ballpark, courts must determine the value of a settlement that contains contingencies and nonmonetary consideration. (Haning, et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2013) ¶ 4:185.11 to 4:185.12a, p. 4-92.2 to 4-92.3; e.g., *Southern Cal. Gas Co. v. Superior Court* (1986) 187 Cal.App.3d 1030, 1035-1036 [the value of assignment of insurance bad faith cause of action must be established to determine the credit to which nonsettling defendants are entitled].) Because courts are capable of estimating the value of settlements with contingencies, nonmonetary consideration, or both, we conclude, in the context of motions for attorney fees under section 1021.5, they also are capable of estimating the monetary value of benefits obtained in litigation that are not immediate and direct. Therefore, we will not adopt a bright-line rule of law that precludes the trial court from considering and estimating the monetary value of benefits that are not immediate and direct.

### 2. Special Rules for Attorney Fees in Conflict of Interest Cases

Plaintiffs contend that the trial court erred in failing to award attorney fees for the violation of the conflict of interest provision in Government Code section 1090.

Plaintiffs argue the following rule of law should be adopted: When a plaintiff succeeds on his or her conflict of interest claim, the trial court should be precluded from determining whether that plaintiff's personal economic interest is out of proportion to his or her individual stake in the matter. Plaintiffs' rationale for this rule of law is that the public policies served by the conflict of interest statute are so important they should override any requirement for weighing the economic benefit obtained by the successful plaintiff.

We reject plaintiffs' position because adoption of the proposed rule of law would be the equivalent of rewriting the existing legislation, which is not our role. In Code of Civil Procedure section 1858, the Legislature stated that courts do not have the authority "to insert what has been omitted, or to omit what has been inserted" in a statute.

Here, the conflict of interest legislation codified at Government Code section 1090 and related sections do not include an attorney fees provision. The absence of a provision specifically applicable to conflict of interest litigation demonstrates that the Legislature intended private lawsuits brought to enforce those prohibitions to be governed by the attorney fees provisions in section 1021.5. Furthermore, in applying section 1021.5 to conflict of interest litigation, we cannot pick and choose those statutory elements that we believe should apply and discard the remainder. Instead, the statute must be applied as written. (Code Civ. Proc., § 1858.)

### 3. Award For Enforcing CEQA

Plaintiffs contend that they obtained no benefit from the CEQA claims included in their lawsuit and, therefore, they should be reimbursed for the financial burden of including those claims in the litigation.

As background, we note that because the purpose of CEQA and its environmental review process is to protect the environment and informed self-government (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392), the plaintiffs who succeed in enforcing the provisions of CEQA generally are held

28.

to have enforced important rights affecting the public interest (*Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 612).

Here, the benefit plaintiffs obtained from the litigation was delaying the project and the competition it would generate. It appears that the relief granted under CEQA—a writ directing that the Board of Trustees redo parts of the final EIR—contributed to the delay of the project. In other words, plaintiffs have not carried their burden of showing that they obtained no benefit from the CEQA portion of the litigation.

### 4. Attorney Fees Related to First Appeal

Plaintiffs also claim the trial court erred in failing to award attorney fees for prevailing on the first appeal. They argue that they satisfied all of the elements of section 1021.5 in prevailing on the first appeal. (See *LandValue 77*, *supra*, 193 Cal.App.4th 675 [judgment affirmed in part and reversed in part].)

Because our previous analysis deals with the application of the elements of section 1021.5 to the litigation as a whole, we will interpret plaintiffs' argument as contending that section 1021.5 should have been applied separately to the appeal and, even if plaintiffs did not qualify for attorney fees in the underlying action, they should have been awarded the attorney fees incurred in pursuing the appeal.

We will assume, without deciding, that section 1021.5 allows the appeal to be analyzed separately for purposes of determining plaintiffs' eligibility for an award of attorney fees. In applying the elements of section 1021.5 to the appeal, we conclude that plaintiffs have not satisfied all of the statutory elements and, therefore, are not eligible for a separate award of attorney fees incurred in pursuing that appeal. In particular, the results plaintiffs achieved were minor compared to the substantive points that they lost. They were unsuccessful in their attempt to obtain an order enjoining construction of the project and an order voiding both the lease and the development agreement between the University and the developer. A further indication of the mixed results obtained is our

29.

directive that the parties would bear their own costs on appeal. (*LandValue 77*, *supra*, 193 Cal.App.4th at p. 684.)

In summary, when the appeal is analyzed separately, plaintiffs do not qualify as the successful party in that portion of the litigation.

### G.    Analysis of the Trial Court's Rationale

Having examined the specific claims of error raised by plaintiffs, the last step in our analysis is to review the trial court's rationale for an abuse of discretion. (*Robinson*, *supra*, 202 Cal.App.4th at p. 391 [appellate courts pay particular attention to trial court's stated reasons for denying fees under § 1021.5].)

The trial court made general findings that plaintiffs had an individual stake in the litigation and the litigation resulted in a pecuniary benefit to them. The court stated it had "no way of knowing whether the financial burden of private enforcement requires subsidizing Petitioners' attorneys; Petitioners have not shown the necessity and financial burden of private enforcement are such as to make an award of attorney's fees pursuant to Code of Civil Procedure section 1021.5 appropriate."

#### 1.    Finding Regarding Plaintiffs' Financial Interest

Plaintiffs' verified petition states that LandValue 77, LLC owns the Sierra Vista Mall and that LandValue Management, LLC manages the mall. Huelskamp's July 2009 declaration states that he is the managing member of both limited liability companies, but does not disclose what direct or indirect ownership interests, if any, Huelskamp holds in these limited liability companies[8] or any business that is a tenant at the mall. This failure

---

[8]    Plaintiffs' moving papers indicated that LandValue 77, LLC was the entity paying their legal fees. If plaintiffs are implying that only the financial stake of the entity paying the legal fees is relevant to the inquiry into their financial incentives, we reject such an argument and conclude that the inquiry extends beyond the veil of any corporation or limited liability company to the interests of the person or persons controlling such entities. (*Save Open Space Santa Monica Mountains v. Superior Court* (2000) 84 Cal.App.4th 235, 247-250 [information about contributors to nonprofit organization's

to provide information about Huelskamp's individual ownership interest and, thus, his stake in the litigation was addressed only in some measure by the judicial admission that Huelskamp held a partial interest in the movie theater at the Sierra Vista Mall.[9]

The foregoing evidence is sufficient to support the trial court's general finding that plaintiffs had a financial interest in the businesses being conducted at the Sierra Vista Mall and also supports the following statement made by the court at the August 2011 hearing: "I don't know what [Huelskamp's] individual stake is. I agree with you, because you didn't give it to me."[10] In short, plaintiffs failed to provide the trial court with enough information to perform an objective evaluation of plaintiffs' stake in the businesses located at the mall. Without this information, the court was not able to identify and quantify the impact of the litigation on those interests. For example, even if the court was able to estimate the monetary value that the delay in competition had on the theater business, it would not have been able to identify how much of that monetary value accrued to the benefit of Huelskamp and the limited liability companies.

litigation fund was relevant to § 1021.5 attorney fees request and, thus, discoverable because evidence suggested case was litigated by and for their private benefit rather than in the public interest].)

[9] During the hearing on the motion for attorney fees, Huelskamp's attorney stated that "Mr. Huelskamp has a partial interest in the movie theater." The trial court appeared to accept this representation of fact insofar as it went, but believed more specific information was necessary, stating: "So I'd have to know his personal stake. I mean there's a lot of unanswered questions here for me." Defendants have not contested counsel's assertion of fact. Therefore, the statement about Huelskamp's partial interest in the theater at Sierra Vista Mall will be treated as a judicial admission. (See *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752 [oral statement by counsel treated as binding judicial admission].)

[10] Plaintiffs attempted to identify some of the financial interests held by Huelskamp and LandValue 77 by submitting the August 9, 2011, declaration of Huelskamp on the day of the hearing. The trial court properly rejected the declaration as untimely. (See fn. 2, *ante*.)

Plaintiffs' failure to adequately identify their financial stakes or interests in the business being conducted at the mall justifies the trial court's conclusion that plaintiffs failed to show the financial burden of private enforcement made a fee award appropriate.

### 2. Finding Regarding the Benefit of Decreased Competition

The trial court also found that the litigation resulted in a pecuniary benefit to plaintiffs, but concluded it was not able to estimate the monetary value of the benefits obtained and complete the cost-benefit analysis required by *Whitley*, *supra*, 50 Cal.4th 1206.

This finding implies a further finding that the proposed retail space in the Campus Pointe project would compete with the Sierra Vista Mall for tenants and the tenants would compete for customers. More specifically, the finding implies the 2,700-seat theater proposed for the Campus Pointe project would compete with the theater in the Sierra Vista Mall.

The express and implied findings regarding a pecuniary benefit are supported by substantial evidence, which includes plaintiffs' March 13, 2007, comment letter, the Tocchini declarations in the administrative record, Huelskamp's July 2009 declaration, and plaintiffs' judicial admission. For example, the March 13, 2007, letter from plaintiffs' attorney opposed the Campus Pointe project on the grounds of economic blight and asserted that (1) "the addition of a theater at Campus Pointe will have severe economic consequences regarding other theaters in the Fresno/Clovis area, including the theater at Sierra Vista Mall"; (2) a new theater would "cause the theaters at the Sierra Vista Mall and U[A] Cinema 8 to operate with a loss which could result in these theaters going out of business" because movie theaters primarily attract customers from within a five-mile zone; and (3) the economic impact would not be limited to the theaters themselves, but would include the adjacent and related businesses that rely on the theaters for customers to survive.

This letter and other documents submitted by plaintiffs during the administrative process clearly raised the possibility that the businesses occupying the retail space and theater at the Campus Pointe project would have an adverse economic impact on the businesses located at the Sierra Vista Mall. Plaintiffs addressed the adverse competitive impacts of the Campus Pointe project in a very narrow way, asserting that the competition would not affect the income that LandValue 77 received from the tenant that leased the theater at Sierra Vista Mall. In particular, their memorandum of points and authorities in support of the renewed motion for attorney fees asserted: "[LandValue 77] holds an interest in the Sierra Vista Mall where it receives a portion of the rent paid by the movie theatre tenants. Only if the theatre collects more than a certain floor amount does LandValue 77 get a bonus in addition to its normal rent. Such a bonus has not happened in recent history."[11] By framing their argument so narrowly, plaintiffs failed to address impacts on other financial stakes including (1) LandValue 77's interest as landlord in receiving rent from the mall's other tenants, (2) any equity interest LandValue 77 might have held in the mall's tenants, and (3) any personal interest that Huelskamp might have held in the mall's tenants.

In summary, during the administrative process, plaintiffs presented evidence and arguments regarding the project's economic impact on businesses at the Sierra Vista Mall. Yet, when pursuing a request for attorney fees, they failed to address and negate their earlier position regarding competitive impacts. Given this state of the record, there is adequate support for the finding that delaying the completion of, and possibly preventing the approval of, the Campus Pointe project resulted in a pecuniary benefit to

---

**11** The representations of fact made in this quote were not supported by evidence, although plaintiffs subsequently tried to remedy the lack of evidence by presenting a declaration by Huelskamp on the day of the hearing. (See fn. 2, *ante*.)

33.

plaintiffs, although the evidence in the record was insufficient to allow the trial court to estimate the value of the benefit to the personal financial interests of plaintiffs.

### 3.        Failure to Carry Burden

The foregoing findings of fact provide a legally sufficient basis for the trial court's conclusion that plaintiffs failed to prove that the financial burden of private enforcement was such as to make an award of attorney fees pursuant to section 1021.5 appropriate.

To the extent that plaintiffs contend it was not possible to carry that burden and place a monetary value on delaying competition at Campus Pointe, we disagree.

Plaintiffs could have presented a realistic analysis of the value of delay by (1) estimating the time that the opening of the Campus Pointe theater has been delayed by the litigation and (2) using that time estimate as a basis for calculating the number of customers that the Sierra Vista Cinema 16 was able to retain and the revenue related to those customers.

Estimating the length of the delay would not have been onerous for plaintiffs. The administrative record provides a starting point for quantifying the delay because it contains various estimated completion dates for the part of the Campus Pointe project that included the movie theater. For example, the draft EIR released in September 2006 stated that construction was "expected to begin in the year 2007 with a target completion date of approximately three years after groundbreaking." A more specific estimate was contained in an agenda item for the May 2007 meeting of the University's committee on campus planning, buildings and grounds. That agenda item estimated May 2009 as the completion date for the construction of the retail space containing the Campus Pointe movie theater.

As for estimating the revenue preserved by the delay, the Tocchini declaration contains a formula for estimating the proportion of customers that would have been lost to the newly opened theater. Huelskamp, as a partial owner of Sierra Vista Cinema 16, would have benefited from the preservation of revenue caused by the delay in the

34.

opening of a competing movie theater.  We therefore reject plaintiffs' "George Bailey" argument that they could not calculate the effect of the litigation.[12]

In summary, the trial court correctly determined that plaintiffs failed to carry their burden of establishing the financial benefit side of the cost-benefit analysis required by *Whitley*.

## DISPOSITION

The order denying plaintiffs' motion for attorney fees is affirmed.  Defendants shall recover their costs on appeal.

_____

Kane, J.

WE CONCUR:


_____

Gomes, Acting P.J.


_____

Detjen, J.

---

[12] During the August 9, 2011, hearing, plaintiffs' counsel referred to the movie It's a Wonderful Life, which showed what life would have been without George Bailey, and argued they could not determine how much more money they would have made in a world without a theater at Campus Pointe than a world with a Maya Cinemas's theater at Campus Pointe.